**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TOTAL FINANCE INVESTMENT, INC., | ) | |
| et al., | ) | No. 19 B 03734 |
| | ) | (Jointly Administered) |
| Debtor(s). | ) | |
| | ) | Chapter 11 |
| | ) | Judge Carol A. Doyle |
| | ) | |

**MEMORANDUM OPINION**

The debtors in a group of seven related chapter 11 cases filed a motion seeking a determination under 11 U.S.C. § 505(a) that debtor Car Outlet AC LLC ("COAC") and Car Outlet, Inc. ("Car Outlet"), a related, non-debtor entity, are entitled to approximately $10.8 million in sales tax credits from the State of Illinois. The State responded with a lengthy brief challenging only the court's jurisdiction to determine the tax issue. It did not address the merits of the debtors' arguments. Eventually, in an attempt to avoid waiving any defense to the merits of the motion, the State filed a motion to supplement its response. The motion to supplement will reluctantly be granted to permit full consideration of the issues presented. Regarding the tax motion, the court concludes that it has jurisdiction to determine the tax issues with respect to applications for tax credits made to the State at least 120 days ago. The debtors have demonstrated that COAC and Car Outlet are entitled to the tax credits they seek with respect to those applications, which include most of the tax credits at issue.

1

I.     Background

COAC and Car Outlet sold used vehicles in the Chicago area, often to customers with bad credit.[1]  When a retailer sells a vehicle in Illinois, it must pay what is commonly referred to as sales tax to the Illinois Department of Revenue ("IDOR") within 20 days after delivery of the vehicle.  If the purchase is made on credit, the sales tax can be included in the loan amount but the retailer must pay the full amount of the tax owed up front.  If the customer later defaults on the loan, in certain circumstances the dealer can seek from IDOR either: (1) a credit memorandum evidencing the right to offset the amount of unreimbursed sales tax against other sales tax obligations to IDOR (a "credit memo"), or (2) a cash refund of the amount of unreimbursed sales tax.  Credit memos can be sold to a third party on the open market with IDOR's approval.  COAC is no longer selling vehicles.  The debtors intend to sell the credit memos and use the proceeds to pay creditors under the plan of reorganization.  The proceeds of that sale would fund a significant distribution to creditors.

The majority equity owners of the debtors purchased substantially all the assets of Car Outlet and some of its affiliates in 2014.  Under the purchase agreement, Car Outlet is required to pay to one of the debtors (Total Finance Investment, Inc.) any sales tax refunds, and thus the proceeds of any sale of credit memos, that Car Outlet receives from the State.

Before June 2015, IDOR issued credit memos to Car Outlet within approximately 60 days of filing the claim forms.  During 2015, COAC filed the proper forms - Form ST-557 - seeking credit memos totaling $448,502 for loans that defaulted from July 2014 through March 2015. During 2015 and 2016, Car Outlet submitted the proper forms seeking credit memos totaling

---

[1]The debtors state that more than 45% of customers defaulted on their loans.

$4,125,845 for loans defaulted from June 2012 through March 2015.  Both COAC and Car

Outlet have filed additional Form ST-557 applications that are currently pending before IDOR

seeking an additional $5,751,496 and $689,668, respectively, in credit memos.

In June 2016, IDOR initiated audits of Car Outlet's sales tax payments for the period June

1, 2012 through March 31, 2015 and of COAC's sales tax payments for the period July 1, 2014

through March 31, 2015 (the "ST-556 audits").  IDOR informed COAC and Car Outlet that it

would not review their pending credit memo claims until those audits were completed.  The ST-

556 audits were completed two years later, in June 2018.  IDOR then began reviewing the

pending credit memo claims.  In October 2018, IDOR issued a Notice of Proposed Claim Denial

to Car Outlet denying $4,125,845 of claims relating to loans that defaulted from June 2012

through March 2015.  A few days later, IDOR issued a similar Notice of Proposed Claim Denial

to COAC, denying $448,502 in claims for defaults that occurred between July 2014 and March

2015.

The reasons given in both notices of proposed denial of claims are identical:  (1) journal

entries showed that COAC and Car Outlet had not borne the burden of the tax on the

transactions; (2) documentation provided did not reflect that the tax had been charged off as bad

debt in accordance with generally accepted accounting principles; and (3) documentation did not

show that the tax had been claimed as a deduction on federal income tax returns.

The debtors now ask the court to determine under § 505(a)(1) of the Bankruptcy Code, 11

U.S.C. § 505(a)(1), that COAC and Car Outlet are entitled to all the credit memos they have

sought from the State and to order IDOR to issue the credit memos.

II.     State's Request to Apply Rule 12 of FRCP and Motion to File Supplemental Brief

The State filed a written response to the motion but it raised solely jurisdictional issues.

It failed to make any arguments on the merits of the motion.  Instead, it asked the court to apply

Rule 12 of the Federal Rules of Civil Procedure to the motion.  It acknowledged that the motion

is a contested matter governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.  Rule

9014(c) provides that many, but not all, of the Federal Rules of Bankruptcy Procedure apply to

contested matters.  It lists 24 of the rules in Part VII (the 7000 series) of the Federal Rules of

Bankruptcy Procedure that apply to contested matters.[2]  Those rules incorporate, in whole or in

part, various rules in the Federal Rules of Civil Procedure.  Noticeably absent from the list in

Rule 9014(c) of Part VII rules that apply to contested matters is Rule 7012.  It incorporates most

of Rule 12 of the Federal Rules of Civil Procedure.  Rule 9014(c) also provides that the court

may, at any stage of the proceedings, "direct that one or more of the other rules in Part VII shall

apply."  Fed. R. Bankr. P. 9014(c).

The State asked the court to apply "Part VII of the Federal Rules of Bankruptcy

Procedure, and in particular FRBP 7012."  There is no need to apply "Part VII" of the rules to

this motion.  Rule 9014(c) already applies all of the rules in Part VII that are needed.   The court

will not apply Rule 7012 to this proceeding.  It governs motions to dismiss.  There is no such

thing as a motion to dismiss a motion.  A motion is either granted or denied; it is not

"dismissed."  Rule 12 need not be applied for the State to make jurisdictional arguments or any

other arguments.  It is free to raise them, as it did, in its response to the motion.  The State cited

---

[2]Part VII (Rules 7001-7087) of the Federal Rules of Bankruptcy Procedure apply to
adversary proceedings, which are separate lawsuits filed under the umbrella of a bankruptcy case.

no authority in its response for its request to apply Rule 12 to motions, nor did it provide any compelling reason to do so. The request is denied.

The court could conclude that the State waived any defenses to the merits of the motion. As the State is well aware, all arguments must be raised in a response to a motion or they may be deemed waived. *See, e.g., Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) (argument is waived if it is not raised at the proper time); *Constant Compliance, Inc. v. Emerson Process Management Power & Water Solutions, Inc.*, 598 F. Supp. 2d 842, 848 (N.D. Ill. 2009) (same); *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) (arguments not raised in responsive papers are waived); *Gillo v. Gary Community School Corp.*, 14-cv-99, 2016 WL 4592200, at *5 (N.D. Ind. Sept. 2, 2016) (same); *In re World Marketing Chicago, LLC*, 564 B.R. 587, 593 n. 4 (Bankr. N.D. Ill. 2017) ("Nothing allows a party to pick and choose which parts of a matter it will defend, and later seek a second bite at the apple.")

If the State sought leave to raise jurisdictional arguments in a first round of briefing and to preserve its right to make arguments on the merits of the motion if its jurisdictional arguments were rejected, it should have sought that treatment of the issues before its response was due. It could have asked the court to bifurcate the issues or made its request for the application of Rule 12 to the debtors' motion at any time during the two months between the filing of the tax motion and the filing of its response. It did neither, despite missing the first deadline for filing a response, getting an agreed 15-day extension from the debtors, and then filing two motions to extend the time to file a response. Instead, the State finally filed a 28-page response to the motion almost two months after the motion was filed that failed to discuss the merits of the tax issues. It had more than sufficient time to address jurisdictional issues and tax issues. Its choice

not to respond to the merits of the motion could easily be deemed a waiver of any such arguments.[3]

The court was finalizing an opinion concluding just that when the State filed a motion to supplement its response. During a hearing on the motion held soon after it was fully briefed, debtors' counsel asked if the court intended to grant the State's request to apply Rule 12 to the motion. The court responded that it would not - the tax motion was fully briefed and the court would issue a decision as soon as possible. Two weeks later, the State filed its motion to supplement its response to address the merits of the motion.

The motion to supplement is less than 2 pages long and cites no authority. It says only that no one will be prejudiced by the State filing a second response more than three months after its response was originally due. The State's assertion is not correct. The case was set for a hearing on confirmation of the plan just three weeks from the date of presentment of the State's motion to supplement. The debtors, the committee, and all creditors are all affected by the State's delay in presenting defenses to the merits of the motion. It continued the uncertainty regarding the resolution of this issue and its impact on confirmation by many more weeks. It also significantly reduced the time available for the court to consider the issues and rule before the confirmation hearing.[4]

---

[3]The undersigned judge has never applied Rule 7012 to a motion. The State had no reasonable basis for expecting the court to apply Rule 7012 or permit it to file a substantive response to the motion later if the court rejected the jurisdictional arguments raised in its response.

[4]The State raised additional bases for granting its motion to supplement for the first time in its reply, which also is not permitted. Bankruptcy Rule 9013 provides that any party seeking relief from the court must file a motion setting forth the basis for the relief sought. It provides that a "motion shall state with particularity the grounds therefor, and shall set forth the relief or

Nevertheless, the court read the State's proposed supplemental response to the tax

motion.  Because it appeared to have potential merit, the court required the debtors to file a

response before the motion to supplement was presented to the court so the issues could be fully

briefed as soon as possible.  The court will reluctantly grant the State's motion to supplement its

response so that all the issues can be decided on the merits rather than by default.


III.    Jurisdiction

The State argues that the court lacks jurisdiction to decide the issues raised in the debtors'

motion.  Some of its arguments apply to both COAC and Car Outlet, while one applies only to

Car Outlet.


A.      COAC's Tax Credit Claims

The State challenges the jurisdiction of the court to determine COAC's right to credit

memos on three grounds.  First, it argues that the court has no jurisdiction to decide at least some

of the requests for credit memos because they are really requests for refunds governed by §

505(a)(2)(B) and the applicable time period in that section has not passed for all of the claims.

Second, the State contends that the court has no jurisdiction under § 505(a)(2)(B)(i) to determine

---

order sought."  Fed. R. Bankr. P. 9013.  A party may not raise new matters in reply to support its
motion or objection.  *See, e.g., Gonzales v. Mize*, 565 F.3d 373, 382 (7th Cir. 2009); *Simpson v.
Office of the Chief Judge of Will Cty.*, 559 F.3d 706, 719 (7th Cir. 2009).  The State argues in its
reply, in effect, that it should not be held to the same standard as other parties because of its
assertion of sovereign immunity.  Those additional arguments were not persuasive.  The rule
prohibiting "two bites at the apple" in responding to motions applies to everyone, including
states.  It easily could have and should have either sought leave to bifurcate the issues before it
filed its response or addressed the merits as well as jurisdiction in that response.

the right to the credit memos because the applications were made to the State before the

bankruptcy cases were filed.  Finally, the State asserts that the doctrine of sovereign immunity

bars the court from exercising its jurisdiction under § 505(a).  Each argument is addressed below.


1.      <u>Section 505(a)</u>

Section 505(a) contains a broad grant of jurisdiction to bankruptcy courts to determine tax

issues.  As the Seventh Circuit has held, "the bankruptcy court may 'determine the amount or

legality of any tax' in a bankruptcy proceeding.  As we have observed, '[t]he Bankruptcy Code

expressly authorizes bankruptcy courts to decide tax issues, 11 U.S.C. § 505(a)(1), and although

*state* taxes are not specified, the courts have interpreted the statute to cover them.'" *Bulk*

*Petroleum Corp. v. Kentucky Dept. of Revenue*, 796 F.3d 667, 670-71 (7th Cir. 2015) (*citing In re*

*Stoecker*, 179 F.3d 546, 549 (7th Cir. 1999), *aff'd sub nom. Raleigh v. Ill. Dept. of Revenue*, 530

U.S. 15 (2000)).

Section 505(a)(1) provides that the court may determine the amount or legality of any tax,

except as provided in § 505(a)(2).  Section 505(a)(1) states:

> (a)(1)   Except as provided in paragraph (2) of this subsection, the court may
> determine the amount or legality of any tax, any fine or penalty relating to a tax, or
> any addition to tax, whether or not previously assessed, whether or not paid, and
> whether or not contested before and adjudicated by a judicial or administrative
> tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).

Section 505(a)(2)(B) then imposes what amounts to a waiting period before a bankruptcy

court can determine the right to a tax refund.  It provides:

8

(2) The court may not so determine -
>    (B) any right of the estate to a tax refund, before the earlier of -
>>        (i) 120 days after the trustee properly requests such refund from the government unit from which such refund is claimed; or
>>        (ii) a determination by such government unit of such request; or . . . .

11 U.S.C. § 505(a)(2)(B).[5]

### 2.    Tax Credits versus Tax Refunds

The State first contends that the credit memos that COAC (and Car Outlet) seek are the equivalent of tax refunds that are governed by § 505(a)(2)(B).  It argues that the court cannot determine whether COAC is entitled to at least some of the credit memos sought because 120 days have not passed since the requests were made to the State.  It admits that the claims for credit memos that COAC filed in 2015 (and that Car Outlet filed in 2015 and 2016) satisfy this requirement.  It contends that the debtors concede that some of the claims for credit memos were filed less than 120 days before the debtors filed this motion.  It asserts that the debtors have the burden of establishing that the 120-day period has passed for any credit memos they seek.

Thus, the first issue raised by the State is whether a credit memo, which is a tax credit, should be considered a tax refund for purposes of § 505(a)(2)(B).  The State asserts that Illinois law permits a taxpayer to seek, at its option, either a credit memo or a cash refund of the sales tax.  *See* 35 ILCS § 120/6.  It acknowledges that if a credit memo is requested and issued, it can be used to satisfy future tax liabilities or it can be sold in accordance with IDOR's regulations to

---

[5]Section 505(a)(2)(A) provides that the court may not determine the amount of a tax if it was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the bankruptcy case was filed.  This provision does not apply because the issues raised by COAC and Car Outlet were not contested before a court or administrative tribunal.  Section 505(a)(2)(C) addresses ad valorem taxes and also does not apply here.

another retailer.  It contends that "the reality" is that the only difference between a credit memo and a cash refund is which option the taxpayer chooses.  It argues that the options are essentially identical and that the court should treat a request for a credit memo as a request for a refund governed by § 505(a)(2)(B).

They are not identical.  While the amount of a credit memo and a cash refund would be the same, the two choices have very different attributes.  A cash refund can be used by the recipient in any way it chooses without regard to any sales tax liability.  It also requires the State to use appropriated funds to pay cash from the State's treasury.  A credit memo, on the other hand, can be used only to offset sales tax liabilities to the State, either by the taxpayer to whom it is issued or by another retailer who purchases it.  It does not require the State to use its appropriated funds to tender cash.  Also, some provisions of the statute apply only to cash refunds.  Under 35 ILCS § 120/6, refunds will be issued only if sufficient funds appropriated for that purpose are available.  This provision also authorizes IDOR to issue refunds in "hardship" cases in which the claimant cannot use a credit memorandum when appropriated funds are not available.  There are no such limits on the issuance of credit memos.  The fact that a taxpayer can choose either option (at least in theory) does not render them identical.

The State cites no authority for its position.  The debtors rely on *In re Continental Airlines, Inc., et al.*, 149 B.R. 76 (D. Del. 1993), to argue that a request for a tax credit is different from a request for a tax refund and can be determined without regard to the 120-day time period in § 505(a)(2)(B).  The *Continental Airlines* court stated that § 505 "clearly delineates between determinations regarding the amount and legality of taxes and those requests for refunds." *Id.* at 85.  It

10

concluded that the bankruptcy court could determine under § 505(a)(1) whether a tax credit was

due to a debtor that had converted a request for a cash refund to one for a tax credit. *Id*.

The State attempts to cast doubt on the *Continental Airlines* decision by stating that an

unpublished opinion of the Third Circuit reversed the district court's decision on this issue. The

State bases this assertion on a reference to that unpublished opinion in *In re St. John's Nursing*

*Home, Inc.*, 169 B.R. 795 (D. Mass. 1994). The *St. John's* court was considering how time limits

for seeking a refund from a taxing body affect the court's jurisdiction under § 505(a). It quoted

an unpublished Third Circuit opinion in *Continental Airlines*. The quotation suggests that the

district court was reversed because the debtor had not filed a timely request with the taxing body,

not because the distinction between a tax refund and a tax credit was not valid. *Id.* at 802. This

does not mean, however, that the district court's *Continental Airlines* decision should be

followed. The court provided no reasoning to support its conclusion that a tax credit is not the

equivalent of a request for a refund for purposes of

§ 505(a)(2)(B). The decision is not particularly persuasive.

Although the right to a tax credit and a tax refund are not identical, the legislative history

suggests that the requests for tax credits in this case fit more neatly within the provision for tax

refunds in § 505(a)(2)(B) than the broader language of § 505(a)(1). Section 505(a) was generally

intended to retain the scope of the bankruptcy court's pre-Code power to adjudicate tax issues.

*See, e.g., In re UAL Corp.*, 336 B.R. 370, 376-77 (Bankr. N.D. Ill. 2006). The current language

of § 505(a) was adopted to permit courts to adjudicate any tax claim involving an unpaid tax,

fine, or penalty relating to a tax under (a)(1) and the amount of a tax refund claim under (a)(2).

*Id.* While § 505(a)(1) could be construed to permit the court to determine the right to tax credits

11

that would be applied to a debtor's tax liability, § 505(a)(2)(B) separates the authority of the

bankruptcy court to adjudicate the right to tax refunds asserted against the taxing body from its

general authority to determine tax issues under (a)(1).  It imposes a time restriction in (a)(2)(B)

that does not apply under (a)(1).  Both the right to a refund and the right to a tax credit are

asserted against the taxing body, while the typical tax claim determined under § 505(a) is

asserted by a taxing body against a debtor.  Requests for tax credits are similar enough to

requests for tax refunds that they should be considered the functional equivalents for purposes of

§ 505(a)(2)(B).  The 120-day waiting period in § 505(a)(2)(B) therefore applies in this case.

The court will determine only COAC's and Car Outlet's right to credit memos sought in

applications they submitted to the State more than 120 days from the date of entry of the final

order on this motion.  This includes the first set of claims as to which the State issued the notices

of proposed denial of claims, which were filed more than 120 days before the bankruptcy cases

were filed.  The bulk of the remaining pending claims have also been pending for more than 120

days and, with the State's delay in responding on the merits, all claims may have been pending

with the State for more than 120 days by the time a final order is entered on the motion.

### 3.    Pre-petition Requests for Tax Credits

The State next argues that the court cannot determine COAC's (or Car Outlet's) right to

credit memos because only a "trustee" can seek such a determination so they must be filed post-

petition.  It acknowledges that § 1107(a) permits a debtor in possession to exercise most of the

rights of a trustee under the Bankruptcy Code, including the right to seek a tax refund under §

505(a)(2)(B).  It nevertheless contends that because § 505(a)(2)(B)(i) refers to "120 days after the

12

*trustee* properly requests such refund from the governmental unit," the request must first be made

after the bankruptcy is filed.  It suggests that there is no trustee or debtor in possession before a

bankruptcy is filed so § 505(a)(2)(B)(i) implicitly limits the court's jurisdiction to determining

only the right to tax refunds sought post-petition.  Since all the requests for the credit memos at

issue in this case were made before the bankruptcy cases were filed, the State argues that the

court does not have jurisdiction to adjudicate them.  This argument has no merit.

Section 505(a)(2)(B)(i) permits the court to determine "any right of the estate to a tax

refund" so long as 120 days have passed since the "trustee" made a proper request.  As the State

recognizes, under § 1107(a), a chapter 11 debtor in possession can assert the rights of a trustee to

seek a tax determination under § 505(a).  The pre-petition debtor and the debtor in possession are

the same entity.  A debtor in possession can exercise all the pre-petition (and post-petition) rights

of the debtor.  *See, e.g., N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188,

1197 (1984) ("it is sensible to view the debtor in possession as the same 'entity' which existed

before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to

deal with its contracts and property in a manner it could not have employed absent the

bankruptcy filing."); *Friedman's Inc. v. Roth Staffing Companies, L.P. (In re Friedman's Inc.),*

2011 WL 5975285 at *4 (Bankr. D. Del. Nov. 30, 2011); *In re Lil' Things, Inc.*, 220 B.R. 583,

587 (Bankr. N.D. Tex. 1998) (the debtor in possession is the same entity as the pre-petition

debtor for the purpose of assuming an executory contract);  *In re LeRoux*, 167 B.R. 318, 321

(Bankr. D. Mass.1994) (same); *In re Mohar*, 140 B.R. 273, 279 (Bankr. D. Mont. 1992) (the

debtor is the same entity it was before bankruptcy for the purpose of determining mutuality and

the right of setoff).  Under § 1107(a), the debtors in possession pursuing their pre-petition

13

applications are considered the "trustee" for purposes of § 505(a)(2)(B)(i).  This section does not require that the debtors in possession make the requests for refunds post-petition.      The State did not cite a single case that supports its argument and it failed to cite the only published decision that addresses this issue.  That court rejected the State's argument that a request for a tax refund must be made post-petition.  *In re Paloma Generating Co.*, 588 B.R. 695, 711-712 (Bankr. D. Del. 2018) (debtor in possession and pre-petition debtor are the same entity and therefore functions as the trustee for purposes of § 505(a)(2)(B)).

The State discusses three courts of appeals decisions that address whether someone other than a trustee can pursue a tax refund under § 505(a)(2)(B).  It acknowledges that two of those decisions do not support its argument.  The third decision does not support its argument either.

In *Internal Revenue Service v. Luongo (In re Luongo)*, 259 F.3d 323 (5th Cir 2001), the court rejected the IRS's argument that the bankruptcy court lacked jurisdiction to determine whether an individual chapter 7 debtor had the right to a tax refund from the IRS.  The IRS argued that the court had no jurisdiction to determine the right to a refund under § 505(a)(2)(B) because the request was not brought by a trustee and did not affect the bankruptcy estate.  The court held that such an interpretation was contrary to the broad grant of jurisdiction under § 505(a)(1).  *Id*. at 328.  It explained that the legislative history showed that bankruptcy courts were authorized to determine the taxes of the debtor or the bankruptcy estate.  *Id*.  Significantly, *Luongo* was a chapter 7 case so, unlike a chapter 11 debtor in possession, the debtor did not have the statutory authority to exercise the rights of a trustee

under the Bankruptcy Code.  Yet the court still found that the bankruptcy court had jurisdiction

to determine a chapter 7 debtor's right to a tax refund under § 505(a)(2)(B).

Similarly, in *Gorden Sel-Way, Inc. v. United States (In re Gorden Sel-Way, Inc.)*, 270

F.3d 280 (6th Cir. 2001), the Sixth Circuit held that the bankruptcy court had jurisdiction to

determine a chapter 11 debtor's entitlement to a tax refund after confirmation of a liquidating

plan.  Like the *Luongo* court, the Sixth Circuit discussed the broad jurisdiction given to

bankruptcy courts under § 505(a) to determine the merits of any tax claim of the debtor or the

bankruptcy estate.  *Id*. at 285.  It held that § 505 "was not intended to restrict the bankruptcy

court jurisdiction to claims of trustees over property of the estate."  *Id*.  Instead, it "authorizes the

bankruptcy court to rule on the merits of any tax claim" of the debtor or the estate.  *Id*.  It noted

that many courts, including *Luongo*, have rejected similar "attempts to restrict the use of other

bankruptcy provisions to trustees," citing a number of cases.  *Id*.  It concluded that the post-

confirmation debtor could assert the right of a trustee under § 505(b) to seek a tax refund.

The State urges the court to reject those decisions and instead embrace *United States v.*

*Bond*, 762 F.3d 255 (2nd Cir. 2014).  It contends that the *Bond* court held that jurisdiction under §

505(a)(2)(B) is limited to refund requests made by a trustee.  This is not correct.  To the contrary,

the court expressly recognized the right of a chapter 11 debtor in possession to exercise the rights

of the trustee under § 505(a).  *Id*. at 257, 262.  In *Bond*, a liquidating trustee appointed under a

confirmed chapter 11 plan attempted to obtain a tax refund through a bankruptcy court

proceeding.  In rejecting that attempt, the Second Circuit explained that a liquidating trustee is

created under a plan, not the Bankruptcy Code, and is entirely distinct from a bankruptcy trustee

and a debtor in possession.  *Id*. at 261-62.  The court held that a bankruptcy court cannot expand

its jurisdiction to cover tax refund claims filed by a liquidating trustee.  It noted that the debtor in

possession had failed to file its refund claim before confirmation of the plan and this failure "had

a jurisdictional consequence that could not be cured by the Liquidating Trustee or a Plan

provision."  *Id.* at 261.  It stated that the bankruptcy court could not determine tax claims "unless

they were initiated by *a debtor* or a trustee in bankruptcy."  *Id.* at 262 (emphasis added).  The

court thus expressly acknowledged that a debtor could have pursued such a refund claim if it had

done so before confirmation and the transfer of all estate assets to a liquidating trust.  The case

provides no support for the State's argument that only a trustee can pursue a tax refund under §

505(a)(2)(B) and therefore the request must be made post-petition.

 Here, the debtors in possession can assert the "right of the estate to a tax refund" as

permitted under § 505(a)(2)(B) as long as the requests were made to the government unit at least

120 days before the date of the court's determination.  The use of the word "trustee" should not

be construed to impose, in effect, two time restrictions:  first, that the request must be made after

the bankruptcy case is filed, and second, that 120 days must have passed since the request was

made.  If Congress intended to impose two separate time restrictions on requests for refunds, it

would have said so.

 As the *Luongo* court noted, § 505(a)(1) "grants the bankruptcy court jurisdiction over *any*

*tax claim*, including refund claims."  259 F.2d at 329, n.4.  Section 505(a)(2)(B) then prescribes

"limits particular to the bankruptcy court's ability to determine a refund."  *Id.*  "The intended

purpose of subsection (a)(2)(B) was to prevent a refund claim from languishing in the

administrative processes, not to restrict the scope of the bankruptcy court's jurisdiction over

refunds to those benefitting the estate."  *Id.*  *See also Stoecker*, 179 B.R. at 549 ( "If federal

16

courts could not determine the debtor's liability for state taxes . . . bankruptcy proceedings would

be even more protracted than they are."). The 120-day period was adopted to strike a balance

between the need for a timely resolution of tax issues while giving the taxing authority a

reasonable opportunity to consider the request and make a determination. *See In re Maley*, 152

B.R. 789, 793 (W.D.N.Y. 1992). Both purposes are fulfilled if the taxing authority has 120 days

from either a pre-petition or a post-petition application. The court has the authority under §

505(a)(2)(B) to determine the pre-petition applications for credit memos in this case.[6]


4.     Sovereign Immunity

The final jurisdictional argument raised by the State with respect to COAC is that the

doctrine of sovereign immunity precludes this court from determining COAC's right to the credit

memos. This argument has no merit.

---

[6]The debtors also argue that IDOR has already made a "determination" of COAC's and
Car Outlet's first set of requests for credit memos for which IDOR issued the Notices of
Proposed Claim Denial. The debtors therefore contend that these two requests fall within §
505(a)(2)(B)(ii), which permits the court to determine the right to a tax refund once a
"determination by such governmental unit" has been made. The State responds that its notices
were not "final" determinations. While this may technically be true, § 505(a)(2)(B)(ii) does not
require a "final" determination. The State has made a "determination" for purposes of §
505(a)(2)(B)(ii). All the procedures that apply after it issues such a notice are, in effect, part of
an appeal process. The retailer has 60 days to elect to take the matter before an Informal
Conference Board. COAC and Car Outlet chose not to do that. After 60 days expire, IDOR may
issue a "final" denial of the claims. Though it has not done so, its determinations in the notices
of proposed claims denials are, in effect, final in any event. *See* 86 Ill. Admin. Code §
215.115(a). Section 505(a)(2)(B)(ii) would only apply to permit the court to determine COAC's
and Car Outlet's right to the first set of credit memos applied for, not the later applications, but it
provides an alternative basis for the court to decide COAC's and Car Outlet's rights to the credit
memos sought in those applications.

-_Katz_

The State, in effect, recognizes that the Supreme Court's most recent decision addressing the sovereign immunity of states in bankruptcy proceedings rejected the State's argument.  In _Central Virginia Community College v. Katz_, 546 U.S. 356 (2006), the Court held that states consented to bankruptcy jurisdiction over them when they ratified the Constitution.  In discussing the history of the Bankruptcy Clause, the Court noted that "[t]hen [in the 18th century] as now, the jurisdiction of courts adjudicating rights in the bankruptcy estate included the power to issue compulsory orders to facilitate the administration and distribution of the res." _Id_. at 362.  The Court explained that the Bankruptcy Clause "was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena." _Id_. at 363.  It concluded that the Eleventh Amendment was not relevant to the inquiry.  Instead, the court held that, "in ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the _in rem_ jurisdiction of the bankruptcy courts." _Id_. at 378.

-A _Res_ to Support _In Rem_ Jurisdiction

The State attempts to distinguish the holding in _Katz_ by arguing that there is no _res_ in this case that could give rise to the bankruptcy court's _in rem_ jurisdiction over this dispute.  It relies on an earlier Supreme Court decision, _United States v. Nordic Village, Inc._, 503 U.S. 30 (1992).  The _Nordic Village_ court concluded that a previous version of § 106 of the Bankruptcy Code abrogating sovereign immunity was insufficient to permit a chapter 7 trustee to recover from the federal government an unauthorized post-petition transfer that an individual used to pay his

18

personal taxes.  The State contends that COAC is seeking the equivalent of a money judgment

from the State that is not permitted under *Nordic Village*.  It also argues that the states could

nothave agreed to the exercise of the bankruptcy court's power under § 505(a) because this

statutory provision dates back only 60 years, not to the time the Constitution was ratified.

The State's arguments are not persuasive for at least three reasons.  First, *Katz*, decided

after *Nordic Village*, held that the states "acquiesced" in subordinating their sovereign immunity

for purposes of the Bankruptcy Clause, so no waiver of sovereign immunity under the Eleventh

Amendment is required.  It also concluded that a chapter 11 trustee could recover a preferential

transfer from entities asserting state sovereign immunity despite the *Nordic Village* conclusion

that § 106 was insufficient to waive sovereign immunity in bankruptcy proceedings.  Thus, the

*Nordic Village* analysis is no longer relevant.

Second, there is a *res* over which this court is asserting *in rem* jurisdiction - COAC's (and

Car Outlet's) right to tax credits.  This *res* is property of the estate over which this court can

assert jurisdiction under *Katz* without regard to sovereign immunity.  The *Katz* court took a broad

view of the *in rem* jurisdiction of the bankruptcy court.  It explained that the states would have

understood that the laws covered by the Bankruptcy Clause "included laws providing, in certain

limited respects, for more than simple adjudications of rights in the res."  *Katz*, 546 U.S. at 370.

Courts adjudicating bankrupts' estates "historically have had the power to issue ancillary orders

enforcing their *in rem* adjudications."  *Id*.  The "18th century counterparts to today's bankruptcy

trustees – could 'pursue any *legal* method of recovering [the debtor's] property so vested in them

. . . ."  *Id*. at 370 (citations omitted).  The Court further stated that "[c]ritical features of every

bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property,

19

the equitable distribution of that property among the debtor's creditors, and the ultimate

discharge that gives the debtor a 'fresh start' . . . ." *Id.* at 363-64. The *Katz* Court permitted the

trustee to recover payments made to various state institutions of higher learning that asserted the

state's sovereign immunity. The Court ultimately concluded that it need not determine whether

an action to recover a preferential transfer was an *in rem* proceeding because such an action was

squarely within what the states acceded to when they accepted the Bankruptcy Clause.

The *Katz* court noted that the *Nordic Village* court stated as an alternative basis for

rejecting the bankruptcy trustee's argument that an *in rem* "exception" to the assertion of

sovereign immunity under the Eleventh Amendment was "unavailable" because the trustee

sought to recover a "sum of money," not "particular dollars." The *Katz* court then observed that

the trustee in the case before it sought return of both the value of the preference and the actual

property transferred, *i.e.*, not simply a sum of money. Here, to the extent *Nordic Village* has any

application after *Katz*, COAC and Car Outlet do not seek  a "sum of money" from the State.

Instead, they seek credit memos which, as discussed above, are not cash but are a property right

that can be applied only to reduce a retailer's sales tax liability. They are a specific "res," not

merely money, that are the equivalent of the actual property transferred to the State.

The broad scope of the bankruptcy court's *in rem* powers described in *Katz* includes an

action like this to determine the extent of the debtors' assets - their right to credit memos. It is a

"legal method of recovering [the debtor's] property" to which the states subordinated their

sovereign immunity in adopting the Bankruptcy Clause. 546 U.S. at 370.

### -*Bulk Petroleum*

Third, the Seventh Circuit has addressed the precise issue before this court and concluded that sovereign immunity does not preclude a determination of a chapter 11 debtor's right to a tax refund under § 505(a).  In *Bulk Petroleum*, a chapter 11 debtor sought a tax refund under § 505(a) from the State of Kentucky.  The court raised the issue of the state's sovereign immunity *sua sponte*.  It relied on *Katz* to conclude that the states agreed not to assert sovereign immunity in proceedings brought pursuant to "Laws on the subject of Bankruptcies," which included the debtor's claim for a tax refund under § 505(a)(2)(B) from the State of Kentucky.  796 F.3d at 679-80.

The State did not mention this Seventh Circuit decision (nor did the debtors), though it is directly on point.  Instead, the State simply declares that the bankruptcy court's power to adjudicate claims for tax refunds under § 505(a) that are not based on claims filed by a creditor dates back only 60 years so it cannot be within the scope of the bankruptcy laws to which the states agreed when the Bankruptcy Clause was adopted.  After making this sweeping assertion in a single sentence, the State cites only *Paloma*, 588 B.R. at 734.  This undeveloped argument is not compelling.

### -*Paloma*

The *Paloma* decision is contrary to Seventh Circuit precedent and is factually distinguishable in any event.  First, the *Paloma* court noted that the Third Circuit had not addressed the question of state sovereign immunity in bankruptcy after *Katz* so it was addressing a question of first impression in that circuit.  *Id*. at 723.  Here, the Seventh Circuit has addressed

21

the question and concluded that the states have waived their sovereign immunity with respect to tax refund determinations under § 505(a).

Second, the facts in *Paloma* were unusual and significantly different from those in this case. It involved a liquidating trustee created under a confirmed chapter 11 plan seeking a refund of property taxes from a state. The court first analyzed whether the dispute involved the *res* of the bankruptcy estate and therefore fell within the *in rem* jurisdiction of the court for purposes of *Katz*. It concluded that the dispute did not concern the *res* of the bankruptcy estate because, even though the debtor was seeking specific pre-petition property taxes it had paid, those funds were no longer held by the state but instead had been transferred to a county government that could not assert sovereign immunity. The court therefore viewed the debtor's motion to determine its right to a tax refund to be in the nature of a general suit against the state for money damages as to which the state had not waived its sovereign immunity. *Paloma*, 588 B.R. at 731.

In this case, no third party holds the right to the tax credits sought by COAC (or Car Outlet). The credit memos sought are based on specific tax overpayments made to and retained by the State. The credit memos are the *res* to which the court's *in rem* jurisdiction attaches for purposes of *Katz*. As discussed above, the debtors seek this specific "res" that is the equivalent of the actual property transferred to the State, not a money judgment. Thus, while this court did not find the reasoning of *Paloma* compelling on this issue, it would not apply in this case in any event.

After the *Paloma* court determined that the state did not hold a *res* that could provide the basis for rejecting the assertion of sovereign immunity under *Katz*, it next addressed whether the dispute could fall within the ancillary proceedings necessary to effectuate the bankruptcy court's

22

*in rem* jurisdiction.  In that context, it stated that "historical subtext" can sometimes be sufficient

to satisfy this test but found that "subtext" lacking with respect to § 505(a).  588 B.R. at 733-34.

The court therefore concluded that it was not within "the core aspects" of the administration of

bankruptcy estates since the eighteenth century because the first version of § 505(a) was adopted

within the past 60 years.  *Id*.  The *Paloma* court cited only a 1995 decision in which the court

examined the history of the provision before deciding that a debtor must have made a timely

request for a refund under state law to invoke the bankruptcy court's jurisdiction under §

505(a)(2)(B).  *See In re EUA Power Corp., et al. v. Town of Seabrook, NH, et al. (In re EUA*

*Power Corp.)*, 184 B.R. 631 (Bankr. D. N.H. 1995).

This court is not persuaded by *Paloma* or its reliance on date of enactment of § 505(a) as

determinative of the scope of the bankruptcy powers to which the states acceded under *Katz*.  As

noted above, the *Katz* court defined the rights of courts administering bankruptcies in the 18th

century very broadly to include marshaling the assets of a debtor and distributing them to

creditors.  But there is no need to resort to "historical subtext" or any other analysis of "ancillary

proceedings" here because this case invokes the *in rem* jurisdiction of the court over a specific

*res*.  For all of these reasons, this court declines to follow *Paloma*.

In *Katz*, the Supreme Court stepped back from some of its previous decisions permitting

states to assert sovereign immunity as a basis for defeating rights created under the Bankruptcy

Code.  It acknowledged  that "[c]areful study and reflection have convinced us" that previous

assumptions and dicta on the question of sovereign immunity as it relates to bankruptcy were

"erroneous."  *Katz*, 546 U.S. at 363.  The Seventh Circuit has applied *Katz* and determined that

state sovereign immunity does not apply to requests under § 505(a) for tax refunds from states.

23

The State's argument is contrary to the Supreme Court's analysis of the states' acceptance of a bankruptcy court's "exclusive jurisdiction over all of the debtor's property," *id*. at 363, and controlling Seventh Circuit authority.  In fact, if sovereign immunity defeated the jurisdiction of bankruptcy courts to decide tax disputes under § 505(a), it would be rendered close to meaningless because most taxing bodies could assert sovereign immunity.  The court rejects the State's argument that sovereign immunity deprives the court of jurisdiction to make the determinations permitted under § 505(a).

B.      Claims of Non-Debtor Car Outlet

The State also challenges the jurisdiction of the court to determine the right of Car Outlet to tax credits because it is not a debtor.  The State contends that, but for the Bankruptcy Code, the Tax Injunction Act, 28 U.S.C. § 1341 ("TIA"), would preclude a bankruptcy court from asserting jurisdiction to enjoin assessment or collection of state taxes or order refunds when state law provides a plain, speedy and efficient remedy.  It also asserts that the doctrine of state sovereign immunity would bar federal jurisdiction over it.  The State therefore contends that, because Car Outlet is not a debtor, the TIA, and sovereign immunity preclude this court from determining its tax liability or entitlement to a refund or tax credit.

The State argues in generalities instead of relying on the language of § 505(a)(1), presumably because § 505(a)(1) contains no language limiting its application to taxes owed by a debtor.  Instead, it provides that the court may determine the amount or legality of any tax, whether or not it has been contested before or adjudicated by a judicial or administrative tribunal, except as provided in § 505(a)(2).  There is no express limitation that the tax be owed only by or

24

to a debtor. While many courts have appropriately noted that construing the statute to confer

jurisdiction over all tax disputes without regard to whether it is related to a debtor or a

bankruptcy estate could lead to absurd results, the statute does not contain any such express

limitation.

In arguing that the court has no jurisdiction over Car Outlet's claims for credit memos,

the State acknowledges that there is plenty of authority for the contrary conclusion - that a

bankruptcy court can determine a tax issue relating to a non-debtor in appropriate circumstances.

*See, e.g., In re Jon Co., Inc.,* 30 B.R. 831 (D. Colo. 1983); *In re H&R Ice Co.*, 24 B.R. 28 (Bankr.

W.D. Mo. 1982); *In re Major Dynamics, Inc.*, 14 B.R. 969 (Bankr. S.D. Cal. 1981)*; Datair

Systems Corp.*, 37 B.R. 690 (Bankr. N.D. Ill. 1983).  It contends, however, that "the consensus

has shifted away from that expansive construction" of § 505(a).  State's Response, p. 15.  This is

not persuasive.

The Seventh Circuit has held that a bankruptcy court can determine the tax liability of a

non-debtor when the debtor's rights are derivative of the non-debtor's rights.  In *Stoecker*, IDOR

had a claim against Chandler Enterprises, Inc. for unpaid sales taxes on its purchase of an

aircraft.  It filed a claim in William Stoecker's individual bankruptcy case asserting that Stoecker

had derivative liability for the taxes as an officer of Chandler.  The district court had held that the

bankruptcy court was precluded by the TIA from deciding Chandler's liability.  The Seventh

Circuit reversed and concluded that the bankruptcy court had jurisdiction under § 505 to

determine Chandler's liability to the extent it impacted the debtor's estate.  As noted above, it

held that § 505(a)(1) "expressly authorizes bankruptcy courts to decide tax issues" and that courts

have interpreted the statute to cover state taxes. 179 F.3d at 549.  The court further held that the

25

TIA did not apply, observing that "[i]f federal courts could not determine the debtor's liability for state taxes - if they had to abstain pending a determination of that liability in state court - bankruptcy proceedings would be even more protracted than they are." *Id*.

The State acknowledges that a bankruptcy court can determine the tax liability of a non-debtor in "limited circumstances." It nonetheless argues that *Stoecker* does not help the debtors because the bankruptcy court had jurisdiction over the State's direct claim against Stoecker anyway. While the State did assert a direct claim against *Stoecker*, it could only be determined by first determining the State's claim against a non-debtor, which the court permitted. The *Stoecker* court permitted the bankruptcy court to determine the tax liability of a non-debtor when it impacted the bankruptcy estate.

The other two appellate decisions discussed by the State do not support its argument that this court cannot determine Car Outlet's right to credit memos. In the first case, *Quattrone Accountants, Inc. v. IRS*, 895 F.2d 921 (3rd Cir. 1990), the Third Circuit rejected the argument the State makes here - that bankruptcy courts cannot determine the tax liability of non-debtors under § 505(a). The court explained that § 505(a) "was intended to *clarify* the bankruptcy court's jurisdiction over tax claims, not *limit* its jurisdiction only to debtors." *Id*. at 924. It rejected a literal interpretation of § 505(a) that would permit the bankruptcy court to determine *any* tax claim without regard to its impact on a debtor*,* but it also rejected the argument that § 505(a) does not permit the bankruptcy court ever to determine a non-debtor's tax liability. Instead of taking either extreme position, the court analyzed the impact of  the dispute between the non-debtor and the IRS on the bankruptcy. Since the dispute involved the personal tax liability of a principal of the debtor and the IRS, the court determined that there would be no impact on the

bankruptcy case. It therefore concluded that the bankruptcy court had no jurisdiction over the matter. Thus, *Quattrone* stands for the proposition that a bankruptcy court can determine the tax of a non-debtor if it will have an impact on the debtor or its estate but not otherwise.

The State also relies on *In re Wolverine Radio Co.*, 930 F.2d 1132 (6th Cir. 1991), to support its argument that this court cannot determine Car Outlet's right to credit memos. This case does not support the State's argument either. While the court discussed jurisdiction over tax issues under § 505(a), the case arose in the context of a motion to enforce an order confirming a chapter 11 plan for the benefit of a purchaser of assets whose post-purchase tax liability was affected by tax debts treated in the confirmed plan. The court ultimately concluded that the bankruptcy court had jurisdiction to determine the tax issue. It discussed jurisdiction under § 505(a) and agreed with the Third Circuit in *Quattrone*, which concluded that § 505 does not limit the bankruptcy court's power to determining only a debtor's tax liability. 930 F.2d at 1140.

The State also included *In re Brandt-Airflex Corp.*, 843 F.2d 90 (2nd Cir. 1988), in a string cite without discussing it. The *Brandt-Airflex* court concluded that the bankruptcy court did not have jurisdiction to determine that another entity was responsible for certain withholding taxes owed by the debtor. The debtor was attempting to use § 505(a) to force the IRS to collect certain taxes from another party who was also potentially liable for the tax so that the plan would not have to provide for payment of the tax. *Id.* at 92. The court held the bankruptcy court could not determine the tax liability of that third party, even if that party might be independently responsible to pay the same tax debt owed by the debtor. *Id.* at 96. It reasoned that the statute, which could be interpreted to permit a bankruptcy court to determine any tax liability of any party, does not provide a basis for deciding which non-debtor tax issues should be decided and

27

which should not. *Id.* It therefore chose a bright-line test to avoid uncertainty, holding that the

bankruptcy court could not determine the tax liability of any non-debtor. *Id.* The Eleventh

Circuit had reached the same conclusion in an earlier decision. *United States v. Huckabee Auto*

*Co.,* 783 F.2d 1546 (11th Cir. 1986).

The State contends that courts' analysis on this issue has evolved and that the tide has

turned strongly in favor of rejecting jurisdiction over any non-debtor tax issue. This is not

correct. The Seventh Circuit's *Stoecker* decision was issued in 1999, more than 10 years after the

*Brandt-Airflex* and *Huckabee* decisions. And neither *Quattrone* nor *Wolverine*, both issued after

*Brandt-Airflex*, adopted a hard and fast rule prohibiting bankruptcy courts from ever determining

tax issues relating to non-debtors. *Stoecker*, *Quattrone*, and *Wolverine* all support the conclusion

that the bankruptcy court may determine the tax liability of a non-debtor when it will have a

direct impact on the debtor or the bankruptcy estate.

Here, the debtors seek a determination of Car Outlet's right to credit memos because the

issues raised are identical to those raised in COAC's claims and Car Outlet is required under the

purchase agreement described above to give any credit memos it receives (and thus the proceeds

of the sale of the credit memos) to one of the debtors.[7] Car Outlet's right to credit memos is

therefore an asset of the bankruptcy estate. Credit memos received by both COAC and Car

Outlet will be sold to third parties and the proceeds will be used to fund the debtors' plans.

---

[7]The agreement provides that if Car Outlet "receive(s) any sales Tax refunds relating to sales taxes that were paid by [Car Outlet] in connection with a transaction underlying an Acquired Contract, [Car Outlet] shall promptly pay or cause to be paid to [Total Finance Investment, Inc.] all such refunds received by [Car Outlet]." Debtor's Reply, p. 3 (quoting Marubeni Agreement). The parties to the agreement obviously intend that if Car Outlet receives credit memos instead of tax refunds, it must transfer the proceeds of sale of the memos to debtor Total Finance Investment, Inc.

28

Therefore, while a bankruptcy court usually should not determine tax issues of parties who are

not debtors, in this case, the court may determine Car Outlet's right to credit memos as assets of

the bankruptcy estate that will be used to fund the plan.[8]


IV.    Bankruptcy Court's Authority to Enter a Final Judgment

No party has challenged this court's authority to enter a final judgment in this matter.

This is not a question of jurisdiction; § 505(a) provides the jurisdictional basis for the bankruptcy

court to decide the issue.  Instead , it is a question of whether, under *Stern v. Marshall*, 564 U.S.

462 (2011), the court has the constitutional authority to enter a final order or must submit

proposed findings of fact and conclusions of law to the district court.  *Stern* held that an Article I

bankruptcy court did not have the constitutional authority to enter a final judgment on a state law

counterclaim that was not a part of the bankruptcy claims process, despite the bankruptcy court's

statutory authority to do so under 28 U.S.C. § 157(b)(2)(C).  Since *Stern*, courts have grappled

with whether bankruptcy courts may enter final judgments in other core proceedings.  This court

reads *Stern* narrowly, consistent with the Court's statement in *Stern* that "the question presented

here is a 'narrow' one . . . .  Congress, in one isolated respect, exceeded that limitation in the

Bankruptcy Act of 1984. "  *Stern*, 564 U.S. at 502, 131 S.Ct. at 2620.

---

[8]The State argues that if the debtors own Car Outlet's right to obtain credit memos, then Car Outlet's requests for credit memos would have to be denied because only the retailer who paid the sales tax can get a refund or credit memo.  This argument has no merit.  Car Outlet has not transferred to another party its right to obtain credit memos from the State.  It has agreed to transfer credit memos or their value to a debtor once it receives them from the State.  This agreement does not deprive Car Outlet of the right to receive credit memos.

29

A proceeding under § 505(a) is not a counterclaim based on state law like the one addressed in *Stern*.  As the State recognizes, § 505(a) is a specific grant of jurisdiction that permits the bankruptcy court to enter an order determining tax issues relating to debtors and the bankruptcy estate.  *See, e.g., Luongo,* ("[T]he IRS's reading of [§ 505(a)(2)(B)] is contrary to the broad grant of jurisdiction in § 505(a) ... permitting a bankruptcy court to determine 'the amount of legality of any tax . . . . '"); 259 F.3d att 329; *Gordon Sel-Way*, 270 F.3d at 286 ("§ 505(a) was not intended to restrict bankruptcy court jurisdiction to claims of trustees over property of the estate.  Rather, it 'authorizes the bankruptcy court to rule on the merits of any tax claim . . . .'").  The determination of tax liability provided for in §505(a) has long been considered a core proceeding, both before and after *Stern*.  *See, e.g., In re Kennedy*, 529 B.R. 345, 349 (Bankr. N.D. Ga. 2015); *In re UAL Corp.*, 336 B.R. 370, 372 (Bankr. N.D. Ill. 2006); *In re Fyfe*, 186 B.R. 290, 291 (Bankr. N.D. Ga.1995); *In re Starnes*, 159 B.R. 748, 749 (Bankr. W.D.N.C. 1993); *In re Lipetzky*, 64 B.R. 431, 433-34 (Bankr. D. Mont. 1986).

The Seventh Circuit permitted a bankruptcy court to enter a final order in a §505(a) matter after *Stern*, finding that "there was no problem here with the bankruptcy court's jurisdiction over [the debtor's] claim" for a refund of excise tax from the Kentucky Department of Revenue.  *Bulk Petroleum*, 796 F.3d at 670.  The court first noted that the matter was a core proceeding involving claims allowance and disallowance.  It then stated that, "Furthermore, the bankruptcy court may 'determine the amount or legality of any tax' in a bankruptcy proceeding," *Id.*  Citing §505(a)(1), the court next observed that "[t]he Bankruptcy Code expressly authorizes bankruptcy courts to decide tax issues . . . ."  *Id.*  The court thus recognized that § 505(a) permits bankruptcy courts to enter final orders on tax issues.

30

A number of bankruptcy courts that have discussed this issue after *Stern* have concluded that they may enter final orders in § 505 matters. *See, e.g., In re Mahon*, 2017 WL 598466 (Bankr. D. Mass. Feb. 14, 2017); *Kennedy*, 529 B.R. at 349; *In re Sarfani, Inc.*, 527 B.R. 241, 247 (Bankr. N.D. Miss. 2015). Other bankruptcy courts have simply entered final orders in § 505 matters without addressing *Stern*. *See, e.g., In re Wyly*, 2015 WL 5042756 (Bankr. N.D. Tex. Aug. 25, 2015); *In re Fugitt*, 2014 WL 3888281 (Bankr. S.D. Miss. Aug. 8, 2014); *In re Slade-Lanier*, 2014 WL 2565919, at *7 (Bankr. N.D. Ohio June 6, 2014). Entry of a final order in this matter under § 505(a) is appropriate.

Even if this matter were considered to fall within *Stern*, the court could still enter a final order resolving it because all parties have implicitly consented. Neither the debtors nor the State have raised the issue at all so they have not expressly consented. But the Supreme Court has held that "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express." *Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, 135 S. Ct. 1932, 1947 (2015). Implied consent is "good enough," especially when the parties are sophisticated and "represented by counsel who can be presumed to be aware of their clients' legal rights." *Richer v. Morehead*, 798 F.3d 487 (7th Cir. 2015). Counsel for the debtors and the State are experienced and sophisticated bankruptcy practitioners who know that they should object if they do not consent to this court entering a final order. They have each filed multiple briefs on this motion. They have not objected so they have implicitly consented.[9]

---

[9]If any reviewing court concludes otherwise, this opinion may be treated as proposed findings of fact and conclusions of law.

V.   <u>Merits of the Tax Issue</u>

COAC and Car Outlet were required to pay Retailers' Occupation Tax and/or Use Tax
("sales tax"), 35 ILCS § 120/2 *et seq.* ("ROTA"), to the State of Illinois on all vehicles they sold.
The retailer must pay the tax based on the sales price charged to the customer within 20 days of
the sale of the vehicle.  The full amount of sales tax due must be paid whether or not the retailer
extends credit to the customer or sells all or any part of an installment loan contract to a
financing company.

Sections 6 and 6d of the ROTA and a regulation promulgated under them by IDOR create
the right to tax refunds or credit memos if the retailer is not paid the full purchase price on which
it paid the sales tax.  Section 6 allows a person who made an "erroneous" tax payment to obtain a
refund or credit memo if the claimant "bore the burden of such amount," has not been relieved of
that burden or reimbursed for the amount, and has no agreement with any party to be reimbursed
for the amount.  35 ILCS § 120/6.  Section 6d, which applies to tax refunds or credit memos
sought after July 30, 2015, specifically addresses a retailer's right to a tax refund or credit memo
for taxes it paid on debts found to be "worthless or uncollectible" that have been charged off as
bad debt in accordance with generally accepted accounting principles ("GAAP"), and have been
claimed as a deduction under section 166 of the Internal Revenue Code in the retailer's federal
income tax return.  35 ILCS § 120/6d.

IDOR's regulation elaborates on the right to tax refunds and credit memos under sections
6 and 6d.  86 Ill. Admin. Code. § 130.1960.  Section 130.1960(d) addresses "Bad Debts."  It
contains various provisions permitting a retailer to obtain a tax refund or credit memo if it has
not been reimbursed in full for the sales tax it paid when the vehicle was sold.  Section

32

130.1960(d)(2) addresses a retailer's right to a tax refund or credit memo applied for through July 30, 2015.  Section 130.1960(d)(2)(A) covers the right to a tax refund or credit memo when a retailer repossesses property for which it has not been paid in full and then resells the property. Section 130.1960(d)(2)(C)) and (2)(D) address retailers who incur bad debt on tangible personal property or an account receivable.

Section 130.1960(d)(3) then addresses "Bad Debt Claimed by Retailers on and after July 31, 2015."  It tracks the statutory language of section 6d, providing that a retailer is relieved of liability for any tax "represented by amounts that are found to be worthless or uncollectible, have been charged off as bad debt . . .  and have been claimed as a deduction" on the retailer's federal tax return.  86 Ill. Admin. Code § 130.1960(d)(3)(A).  The gist of the two statutes and the regulation is that a retailer may only receive a tax refund or credit memo if it has borne the full burden of the sales tax, has written the receivable for the unpaid sales tax off as a bad debt, and taken a deduction for the bad debt on its federal tax return.

The debtors argue that COAC and Car Outlet retained the sole burden of the tax for each sale transaction because the amount of the sales tax was deducted from the price that Total Finance,[10] a related entity, paid for each installment loan contract it purchased.  Total Finance only paid COAC and Car Outlet for the sales tax portion of the installment contracts if and when the purchaser paid off the loan in full.  The debtors therefore contend that Total Finance did not "finance or purchase the sales tax

---

[10]COAC sold its installment contracts to Total Finance AC LLC, a debtor who is an affiliate.  Car Outlet sold its installment contracts to Total Finance, LLC, a non-debtor affiliate. The court will refer to both entities as "Total Finance."

33

portion" of COAC's and Car Outlet's receivables so thoseentities retained the full burden of the

tax liability for each transaction for which it seeks a credit memo.

The State responds that the documents on which the debtors rely show that the entire

installment contracts were sold to Total Finance, not just a portion of those contracts.  It

essentially argues that, because the right to collect sales tax from the car purchaser was sold with

the loan to Total Finance, COAC and Car Outlet did not bear the burden of the tax after the

purchaser defaulted and therefore cannot receive a refund or credit memo.  The State is correct

that Total Finance purchased the entire installment contracts, not just the non-tax portion, but this

is not determinative of the right to a credit memo.

A.      Loans Sold to Total Finance

COAC and Car Outlet did not "retain" any portion of the loan agreements they sold to

Total Finance.  Although the State cites only to 6 pages in a lengthy exhibit (Exhibit E) to the

debtors' motion and fails to make any specific argument on this point, the court has examined

those exhibits as well as the Master Dealer Agreement and determined that the State is correct.

The Master Dealer Agreement between COAC and Total Finance (Exhibit D to the tax

motion) provides for the sale of entire installment contracts, not just some portion of them.[11]  The

---

[11]The debtors state that Car Outlet and Total Finance operated under an agreement that
was virtually the same as the contract between COAC and Total Finance, attached as Exhibit D,
but they have been unable to produce a copy of it.  They believe it was destroyed in a fire at Car
Outlet's premises.  The State has not contested the debtors' assertion that the terms of the
agreement under which Car Outlet and Total Finance operated were essentially the same as those
in the agreement between COAC and Total Finance.  The court will therefore treat the terms of
the agreement in Exhibit D as governing the relationship between Car Outlet and Total Finance
as well as the relationship between COAC and Total Finance.

introductory paragraph defines an automobile sold by COAC as a "Unit."  It states that

periodically COAC may offer to sell and Total Finance may desire to buy certain "retail

installment contracts" defined as "Contracts."  Section 1 of the agreement provides that a

purchase of a "Contract" will occur when Total Finance pays COAC the purchase price after a

document verification procedure, all as set forth in Section 2.  For each Contract that Total

Finance decides to purchase, COAC agrees "to execute an assignment of the Contract in a form

acceptable to Total Finance.  Such assignment shall include all of Dealer's [COAC] right, title

and interest in the Unit."  Ex. D, § 1.  Thus, for any installment contract sold to Total Finance, it

purchased all of COAC's rights in the vehicle and the contract, including its right to collect the

sales tax portion of the purchase price.

Section 2 of the Master Dealer Agreement, entitled "Purchase Price," provides that for

each "Contract" that Total Finance purchases, it will pay COAC a price calculated by taking the

"Amount Financed" in the installment contract, which is the total purchase price (including sales

tax and other fees) less any cash down-payment made by the customer, and deducting a 31%

discount plus the amount paid in sales tax and other charges that are not relevant here.[12]  This

amount is defined as the "Purchase Price."  It must be paid by Total Finance to COAC within 30

days of Total Finance's agreement to purchase a Contract, assuming COAC provides all the

required documents.

Section 2 contains a final paragraph that provides for an additional payment to COAC if

the "Contract" is paid off in full to Total Finance by the customer.  It states:

---

[12]Stated another way, "Purchase Price" = ((.31) x Amount Financed) - (Sales Tax) - (Other Charges).

> In regard to the payment of the Sales and Use Tax by the Dealer, Total will not reimburse Dealer for those amounts until the Contract is fully paid off by Customer. . . . In the event of a default on the Contract by Customer, Total will not pay any amounts to Dealer for the Sales and Use Tax.

Ex. D, § 2.

Under this paragraph, Total Finance must make an additional payment to COAC of the full amount of the sales tax included the Amount Financed under the Contract if the customer pays off the entire loan.  This paragraph does not include the additional payment for sales tax in the definition of "Purchase Price."

Section 2 of the Master Dealer Agreement thus requires Total Finance to make an initial payment - the "Purchase Price" described above - to COAC within 30 days of purchase of a Contract, and an additional payment for the full amount of sales tax if and when the customer pays Total Finance the full amount owed under the Contract.  Total Finance therefore purchased all of COAC's rights under every Contract, including the right to collect any sales tax from the customer.  COAC retained no rights whatsoever under the Contracts.  Thus, contrary to the debtors' assertions, COAC did not "retain" any "portion" of the loan made to the customer.  Instead, it held a contingent right to payment from Total Finance of the sales tax portion of the amount financed.[13]

This is confirmed by a sample agreement referred to obliquely in a parenthetical in the State's supplemental response - Ex. E, pages 25-30.  The first two pages contain a "Retail

---

[13]The debtors assert that COAC booked a receivable for the sales tax owed by Total Finance if the purchaser paid off the loan in full.  They contend that Total Finance was obligated to collect the sales tax on COAC's behalf.  This is not correct.  Nothing in the Master Dealer Agreement or any other document provided imposes this specific obligation on Total Finance.  It was simply required to pay the sales tax component of the amount financed if the customer paid in full.

Purchase Agreement" between Car Outlet and a customer.  It identifies the car purchased and all

the charges that the customer must pay, including the cash price, sales tax, title fee, and

document fee.  It shows a cash down-payment and the "unpaid balance."  Ex. E, p. 25-26.  The

next 4 pages are a "Retail Installment Contract" entered between Car Outlet as "seller" and the

customer.  Ex. E, p. 27-30.  It is an installment loan agreement for the "unpaid balance" under the

Retail Purchase Agreement, which is identified as the "Amount Financed."  The bottom half of

the fourth page contains a paragraph entitled "Seller's Assignment."  Ex. E., p. 30.  The name

"Total Finance" is stamped onto the agreement as the assignee of the contract.  It states that the

Seller (Car Outlet) "hereby sells, assigns and transfers to Total Finance, ASSIGNEE, . . . all of

Seller's right, title and interest in and to the within contract and the motor vehicle described

therein."  It also says that "[t]his instrument is subject to a perfected first lien position security

interest granted to Capital One, National Association . . . AS AGENT," presumably for Total

Finance.  *Id.*  The assignment was executed by someone on behalf of Car Outlet as seller.

This assignment is consistent with the provision of the Master Dealer Agreement under

which COAC sold all of its rights in any Contract sold to Total Finance.  COAC would receive

the "Purchase Price" described above - the amount financed less the 31% discount, sales tax, and

other deductions, and had the conditional right to receive an additional payment for the sales tax

portion of the amount financed if the customer paid Total Finance the full amount owed under

the Contract.  COAC retained nothing but the right to these two payments.

B.    The Burden of the Sales Tax

This conclusion, however, does not resolve the issue here - whether COAC and Car

Outlet retained the burden of the sales tax when a purchaser defaulted on an installment contract.

The State's principal argument is that, under one paragraph of its regulation, the difference

between the selling price of the vehicle to the customer and the selling price of the installment

contract to a finance company is deemed to be a cost of doing business and is not deductible in

computing the retailer's sales tax liability.  86 Ill. Admin. Code § 130.1960(c)(1).  While the

regulation it cites requires this, it has no impact on the analysis here.

Section 130.1960(c)(1) requires the retailer to pay the sales tax based on the full purchase

price of the vehicle to the customer, not a discounted amount the retailer may receive from a

lender who purchases an installment loan contract.  It provides:

>        (1)   When a retailer of tangible personal property sells an installment contract or
> "paper" to a third party, the difference between the selling price of the tangible personal
> property and the selling price of the installment contract or "paper" is a cost of doing
> business and *is therefore not deductible in computing ROT liability*. . . . ROT becomes
> due based on the entire selling price to the purchase of the tangible personal property. . . .

86 Ill. Admin. Code § 130.1960(c)(1) (emphasis added).  It then gives an example of how to

calculate the tax when a retailer sells paper to a third party.  Thus, this provision requires the

retailer to pay sales tax based on the actual purchase price to the customer, not what the retailer

nets after it sells the loan.

Here, the State does not dispute that COAC and Car Outlet paid the full amount of the

sales tax due for each transaction based on the sales price paid by the customer.  COAC and Car

Outlet thus complied with this regulatory provision.  The State's reliance on it is misplaced.  It

does not address the right to a tax refund or credit memo in any way and has no bearing on the issue before the court.

The State cites no authority other than § 130.1960(c)(1) to support its argument that COAC and Car Outlet are not entitled to the credit memos they seek. After stating that this regulation required COAC and Car Outlet to pay sales tax on the full purchase price, the State then simply asserts that COAC and Car Outlet, by selling their interests in the installment contracts without recourse, "therefore do not have a valid claim for a refund or credit based on a bad debt deduction for uncollectible sales taxes." State's Supp. Response, p. 11. This conclusion, however, does not follow from § 130.1960(c)(1). The State thus contends, without relying on any other specific statutory or regulatory provision, that a retailer who sells an installment contract without recourse (*i.e.,* without the right to recover from the retailer if the customer defaults) cannot receive a tax refund or credit memo. Neither the statutes nor IDOR's regulation, however, require a retailer to retain an installment contract as a condition to receiving a tax refund or credit memo. Instead, they focus on who bears the burden of the tax and whether the retailer charged a receivable off as bad debt and deducted it on its federal tax returns.

      1.   <u>Section 6 of ROTA</u>

Under section 6 of ROTA, any party who paid a tax "erroneously" may get a refund or a tax credit from the state if the taxpayer bore the burden of the amount paid and has not been relieved of that burden or reimbursed directly or indirectly for it. 35 ILCS § 120/6(a). It provides that no credit or refund will be given "for any amount paid by or collected from any claimant" unless "the claimant bore the burden of such amount and has not been relieved thereof

nor reimbursed therefor" and will not be reimbursed by anyone for the amount.[14]  *Id.*  This provision applies to all of the transactions in question, whether they occurred before, on, or after July 31, 2015.  Nothing in this section conditions the right to a tax refund or credit memo on the retailer retaining the installment loan contract.  Instead it focuses on who bore the burden of "such amount," which refers to the "amount paid by or collected from" the claimant to the State, *i.e.,* the tax paid by the retailer.  It does not require the retailer to retain the burden of the full amount loaned to the purchaser.

The IDOR regulation that applies to claims for credit memos made on or before July 30, 2015 similarly does not require the retailer to keep the installment loan.  86 Ill. Admin. Code  § 130.1960(d)(2).   Section 130.1960(d)(2)(A) applies to retailers who repossess collateral and then resell it and seek a credit memo before July 31, 2015.  It does not apply here because COAC and Car Outlet sold the right to repossess vehicles to Total Finance with the installment contracts. But repossession is not required for a retailer to obtain a credit memo under § 130.1960(d)(2)(D), which permit retailers to recover taxes paid that become bad debt.  It provides:

---

[14]Section 6 is long and complicated.   The relevant portions are as follows:

> If it appears . . . that an amount of tax or penalty or interest has been paid which was not due under this act, . . . then the Department shall issue a credit memorandum or refund to the person who made the erroneous payment . . . .  No credit shall be allowed or refund made for any amount paid by or collected from any claimant unless it appears (a) that the claimant bore the burden of such amount and has not been relieved thereof nor reimbursed therefor and has not shifted such burden directly or indirectly through inclusion of such amount in the price of the tangible personal property sold by him or her in any manner whatsoever; and that no understanding or agreement, written oral, exists whereby he or she or his or her legal representative may be relieved of the burden of such amount, be reimbursed therefor or may shift the burden thereof; . . . .

35 ILCS § 120/6.

40

(D)   In the case of tax paid on an account receivable that becomes a bad debt, the tax paid becomes a tax paid in error, for which a claim for credit may be filed in accordance with Section 6 of the Retailer's Occupational Tax Act, on the date that the federal income tax return or amended return on which the receivable is written off was filed.

86 Ill. Admin. Code § 130.1960(d)(2)(D).  Thus, under this regulation, a retailer can qualify for a

credit memo for a "tax paid in error" under section 6 of ROTA if an account receivable arising

from the sales tax transaction becomes a bad debt that is properly written off on the retailer's

federal tax return without regard to whether the retailer repossesses the car. [15]

### 2.   Section 6d of ROTA

Section 6d of ROTA also could potentially apply to credit memos sought on or after July

31, 2015, which is the majority of credit memos sought here.  Section 6d provides that a retailer

is relieved from liability for any tax for amounts found to be "worthless or uncollectible" that

have been charged off as bad debt on the retailer's books and records in accordance with GAAP

and that have been claimed as a deduction on the retailer's federal income tax return.  35 ILCS §

120/6d(a).[16]

---

[15]Section 130.1960(d)(2)(C) provides another potential avenue for a retailer to obtain a credit memo without repossessing a car.  It provides:  "Retailers who incur bad debt on any tangible personal property that is not repossessed may also obtain bad debt credit as provided in subsections (d)(2)(A) and (D)."  This appears not to apply here because COAC and Car Outlet sold any right they had in the vehicles to Total Finance.  The receivable in this case that becomes a "bad debt" that can be written off and deducted on a tax return is the receivable due to COAC from Total Finance for the sales tax component of the amount financed.   This receivable is not a "bad debt on any tangible personal property."

[16]Section 6d(a) provides, in relevant part:

(a) A retailer is relieved from liability for any tax that becomes due and payable if the tax is represented by amounts that are found to be worthless and uncollectible have been charged off as bad debts on the retailer's books and records in accordance with generally

It should first be noted that it appears that section 6d does not apply here.  At oral argument, debtors' counsel pointed out that section 6d(b)(4) provides that: "this Section:  (A) does not apply to credit sale transaction amounts resulting from purchases of titled property."  35 ILCS § 120/6d(b)(4)(A).  Although this sentence appears in paragraph (b) of section 6d, which applies only to private label credit card transactions, counsel is correct that the phrase "this Section" appears to refer to the entire section 6d, not just the paragraph covering private label credit cards.  The phrase "this Section" also appears in paragraphs 6d(c) and (d), both of which apply to the entire section 6d and not just the private label credit card provisions in paragraph 6d(b).  The placement of the exclusion for titled assets in the section devoted only to private label credit cards instead of one of the two later paragraphs that apply to the entire provision is odd, but it nonetheless appears to apply to the all of Section 6d.  The court therefore concludes that section 6d does not apply in this case.[17]        Even if section 6d does apply, however, there is no significant difference between the combined effect of section 6 and § 130.1960 and section 6d(a), the only provision in section 6d that could potentially apply here.  Section 6d(a) expressly requires that "amounts that are found to be worthless and uncollectible" be charged off as bad debts in accordance with GAAP and deducted on tax returns.  Section 6 does not refer to "worthless and uncollectible debts," bad debts, GAAP, or tax returns.   But § 130.1960(d)(2), which applies to credit memos sought under section 6, requires the retailer to write the receivable

---

accepted accounting principles, and have been claimed as a deduction pursuant to Section 166 of the Internal Revenue Code on the income tax return filed by the retailer.

135 ILCS § 120/6d(a).

[17]The State discusses section 6d generally but never takes a specific position on whether it applies here or how it could potentially affect COAC's and Car Outlet's right to credit memos.

off as bad debt, presumably in accordance with GAAP anyway, and then take it as a deduction on

its federal tax return.  So the result under both statutory provisions is the same.  The primary

difference between section 6 and section 6d is that section 6d permits a retailer to receive a tax

refund or credit memo for "worthless and uncollectible receivables" on purchases made through

a private-label credit card.  *See* 35 ILCS § 120/6d(b).  Therefore, section 6d, even if it applies,

does not alter the result in this case.

 And section 6d, like section 6, does not require a retailer to retain an installment loan to

be entitled to a credit memo.  It provides that "a retailer is relieved of liability for any tax . . . if

the tax is represented by amounts that are found to be worthless and uncollectible," have been

charged off as bad debts under GAAP, and are claimed as deductions on the retailer's federal tax

return.  35 ILCS 120/6d(a).  Although the phrase "represented by amounts" is curious, it is clear

that the "amounts" that must be worthless and uncollectible are the taxes paid.  This provision

does not require the retailer to retain the entire loan made to the purchaser.

 After section 6d became effective in July 2015, IDOR amended its regulations to add

provisions governing claims for tax refunds or credit memos made on or after July 31, 2015.  86

Ill. Admin. Code 130.1960(d)(3)(A).  Section 130.1960(d)(3)(A), entitled "Bad Debt Claimed By

Retailers on and after July 31, 2015," tracks the language of section 6d.  It provides:

> On and after July 31, 2015, a retailer is relieved from liability for any tax that becomes
> due and payable if the tax is represented by amounts that are found to be worthless or
> uncollectible, have been charged off as bad debt on the retailer's books and records in
> accordance with generally accepted accounting principles, and have been claimed as a
> deduction pursuant to section 166 of the Internal Revenue Code on the income tax return
> filed by the retailer.

86 Ill. Admin. Code § 130.1960(d)(3)(A).  The remainder of the paragraph applies to retailers

who must file monthly returns with the state, which does not include retailers of motor vehicles.

Paragraph (3)(B) then permits retailers of motor vehicles to file claims seeking tax refunds or

credit memos in accordance with § 130.1960(d)(5)(B), which contains the same basic

requirements for writing off "worthless and uncollectible" receivables and requires the retailer to

maintain adequate books and records to support the charge-off of the receivables.  None of these

provisions require the retailer to retain the installment contracts.


### 3.    Applying the Statutes and Regulation

The debtors assert that for each installment contract sold to Total Finance, COAC and

Car Outlet booked the initial purchase price received as income.  They also created an account

receivable for the potential reimbursement of sales tax that would be due from Total Finance if

the customer paid Total Finance in full under the contract.  That receivable was taken as income

at the time of the sale to Total Finance.  It could be written off as bad debt in accordance with

GAAP and taken as a deduction on their federal income tax returns under § 166 of the Internal

Revenue Code if the purchaser defaulted on the loan sold to Total Finance.[18]  COAC and Car

Outlet also assert that they have no right to reimbursement from any source for the sales tax they

paid on loans they sold that later defaulted.  The State does not contest any of these assertions.

Thus, there is no dispute that COAC's and Car Outlet's tax receivables became bad debts that

were properly written off under GAAP and were deducted from their federal tax returns, and that

they have no right to reimbursement for those receivables.   Both COAC and Car Outlet therefore

---

[18]Although these facts were not clear from the briefs filed by the parties, the court held
oral argument on the motion and counsel for the debtors and the State agreed that this is correct.

meet the requirements of section 6 and § 130.1960(d)(2)(D) for the credit memos sought through July 30, 2015, and the requirements of section 6 for any credit memos sought after July 30, 2015.

Assuming that § 130.1960(d)(3) applies to the credit memos sought after July 30, 2015 regardless of whether section 6d applies to sales of motor vehicles, the debtors have established that COAC and Car Outlet complied with all the requirements of this regulatory provision and § 130.1960(d)(5)(B) to which it refers. As noted above, the State does not dispute that COAC and Car Outlet properly booked a receivable for the sales tax amount potentially payable from Total Finance and took that receivable as income when it was booked. Once a customer defaulted on the loan held by Total Finance, the receivable owed by Total Finance to COAC or Car Outlet became "worthless and uncollectible" because they no longer had a right to the additional payment for sales tax. They then properly wrote off the receivable as bad debt in accordance with GAAP and took a deduction for it on its federal income tax returns under § 166 of the Internal Revenue Code. They have no right to reimbursement from any party for the tax paid to the State. The State also does not contend that COAC and Car Outlet failed to keep appropriate books and records supporting their claims for credit memos. The State has thus raised no question of fact regarding Car Outlet's compliance with IDOR's regulation applicable to credit memos sought on or after July 31, 2015.

For the same reasons, COAC and Car Outlet also comply with section 6d if it applies despite the exclusion of titled property in section 6d(b)(4)(A). The tax they paid to the State is "represented by amounts that are found to be worthless and uncollectible" - the tax receivables. Those receivables have been properly charged off as bad debt under GAAP and deducted on federal tax returns.

45

The debtors have therefore established that they meet all of the standards that could possibly apply - under section 6, section 6d, and the applicable provisions of IDOR's regulation - for all the credit memos sought, whether they were submitted before, on, or after July 31, 2015.

4.    <u>Middle Ground</u>

The State makes no specific argument under section 6, section 6d or the regulatory provisions that apply to COAC's and Car Outlet's requests for credit memos. It does not parse the statutory or regulatory language discussed above to explain why it does not permit COAC and Car Outlet to receive credit memos. Instead, the State takes the general position that once a retailer sells an entire installment agreement to a finance company, it is not entitled to a tax credit or refund unless the agreement with the finance company is "with recourse." It explains that there are two typical, clear-cut situations involving claims for credit memos: (1) a retailer who retains the installment agreement and has the right to a tax refund or credit memo if a purchaser defaults, or (2) a retailer who sells the installment contract without recourse who does not have the right to a tax refund or credit memo.[19] Thus, in the State's view, a retailer who keeps the loan can get a credit memo but a retailer who sells the loan without recourse cannot.

---

[19]The parties agree that only a retailer may seek the right to a refund under the statute. A financing company who is assigned the rights of the retailer has no standing to seek a tax refund or a credit memo. *See Citibank N.A. v. Ill. Dept. of Revenue, et al.*, 2017 IL 121634, 104 N.E.3d 400 (2017).

46

The State does not recognize any situation between these two clear-cut examples in which a retailer sells a loan but retains the burden of the tax liability and is therefore entitled to a credit memo.  It contends that because sales tax is included in the calculation of the "amount financed" under the contracts, COAC and Car Outlet can no longer bear the burden of the tax paid in error. It argues, in effect, that it makes no difference that the sales tax component of the "amount financed" was deducted from the purchase price paid by Total Finance and that a second payment is due from Total Finance for the sales tax only if the customer pays Total Finance in full.[20]

The arrangement between the retailers and Total Finance in this case falls between the two clear-cut examples identified by the State.  COAC and Car Outlet have sold the entire contracts to Total Finance "without recourse," but they hold a receivable for the sales tax component of the purchase price that must be paid if the purchaser pays Total Finance in full. Under this arrangement, COAC and Car Outlet do bear the full burden of the sales tax for every loan sold on which the purchaser defaults.  Sales tax is excluded from the initial purchase price received and COAC and Car Outlet never receive the additional payment covering sales tax on defaulted loans.  Thus, though they do not bear the burden of a default on the entire loan, they bear the full burden of the sales tax they paid to the state on defaulted loans.

The State has failed to offer any reasonable basis under the language of ROTA or the regulation for denying the credit memos sought.[21]  COAC and Car Outlet have met their burden

---

[20]COAC and Car Outlet seek credit memos only for the portion of the sales tax due for the unpaid loan balance at the time of the default, not the entire sales tax they paid on the purchase price to the customer.

[21]The State does not even attempt to defend two of the three reasons given for denial of the claims in the Notice of Proposed Claim Denial -  that the documentation provided did not reflect that the tax had been charged off as bad debt in accordance with GAAP and that the

of demonstrating their right to the credit memos under section 6, section 6d and the regulation. The court will therefore grant the debtor's motion and require the State to issue credit memos for all applications made by COAC and Car Outlet more than 120 days from the date the final order is entered on this motion.

C.     Contracts Retained by COAC and Car Outlet

COAC and Car Outlet sold most but not all of their installment contracts to Total Finance.  The State agrees that they are entitled to credit memos on the installment contracts they retained to the extent that the purchaser defaulted, the receivables were "worthless and uncollectible," written off as bad debts, and deducted from their income tax returns, and appropriate books and records are available.  The State asked for a list of those transactions.  The debtors agreed to provide such a list.

The debtors contend that COAC and Car Outlet have complied with all the requirements for receiving credit memos for defaulted loans that they retained.  They wrote off the receivables as bad debt, took the appropriate deductions on their tax returns, and hold no right to reimbursement for the taxes from any party.  The State agrees that they have borne the burden of the tax on these retained contracts.  The State has failed to raise any question of fact regarding COAC's and Car Outlet's right to the credit memos they seek on the retained contracts.  The debtors have therefore established that COAC and Car Outlet are entitled to all the credit memos they seek for retained contracts.

---

documentation did not show that the tax had been claimed as a deduction on federal income tax returns.

VI.    <u>Conclusion</u>

For all the reasons stated above, the debtors' tax motion will be granted with respect to all

applications for credit memos presented to the State at least 120 days before the date of entry of

the final order on the motion.

Dated: June 11, 2019

ENTERED:

_____

Carol A. Doyle
United States Bankruptcy Judge